In the

# United States Court of Appeals

## For the Seventh Circuit

No. 25-2067

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC KENDRICK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:23-cr-00137-2 — **James R. Sweeney II**, *Chief Judge.*

ARGUED APRIL 9, 2026 — DECIDED JULY 9, 2026

Before EASTERBROOK, RIPPLE, and LEE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Eric Kendrick entered a conditional
guilty plea to one count of conspiracy to possess with intent
to distribute and to distribute controlled substances in viola-
tion of 21 U.S.C. §§ 841(a)(1) and 846. He did so after the dis-
trict court denied his motion to suppress evidence obtained
through a camera installed on a utility pole outside his busi-
ness. The pole camera captured activities occurring within the
confines of his property despite a fence surrounding that

property. Mr. Kendrick contends the district court misread our precedent to permit the use of the pole camera to view activities on his property. We cannot accept this argument, and for the reasons set forth in this opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A**

In early 2023, drug enforcement agents received a tip from a confidential informant. This informant reported that Mr. Kendrick was involved in receiving and transporting large quantities of narcotics throughout Indiana. Several agents began a months-long investigation.

As part of the investigation, agents surveilled Mr. Kendrick traveling from central to northwest Indiana. Agents witnessed him entering a residence empty-handed and then leaving with a black bookbag. He returned to central Indiana the next day, and Detective Matthew Kinkade, one of the agents, ordered a traffic stop of Mr. Kendrick's vehicle. During the stop, a narcotics detection canine alerted to the odor of narcotics. A search of Mr. Kendrick's vehicle turned up the black bookbag lying empty on the back floorboard and $12,884 in the locked glovebox. Detective Kinkade determined that, as a result of the stop, Mr. Kendrick became aware that law enforcement authorities had him under surveillance.

Law enforcement agents also learned that Mr. Kendrick leased an auto-repair shop on Massachusetts Avenue in Indianapolis, Indiana. Because he believed Mr. Kendrick knew about the investigation, Detective Kinkade requested that a stationary camera be installed on a utility pole across the

street from the repair shop. Detective Kinkade did not seek a warrant for the camera.

The day after the Indiana State Police confirmed his request, he drove past the property and saw that a six-foot wooden fence had been newly installed. Mr. Kendrick's landlords had arranged for the fence's installation because Mr. Kendrick was leaving inoperable vehicles and debris on the property, and the City had consequently issued a zoning violation notice. The fence ran almost the full perimeter of the property, but it left two gaps. One opening, at a corner of the property, was sufficiently wide to permit a person to walk through. The other gap was about thirty feet wide and had no gates or any other object to prevent access to the property. This gap was sufficiently wide to permit two flatbed trucks and at least one additional vehicle to park side by side. Past the vehicles and behind the thirty-foot gap was a large garage. Detective Kinkade observed individuals using this garage to enter the building.

Installation and activation of the pole camera took place on May 17, 2023. It recorded the events at the property through May 31, 2023. After monitoring the pole camera for about two weeks, Detective Kinkade noticed an increase in activity. He therefore drove to the property on the afternoon of May 31 to surveil it. Using his vantage point outside the property as well as the feed from the pole camera, Detective Kinkade witnessed individuals entering and exiting the property in a manner that he believed consistent with the distribution of large quantities of drugs. After one of those individuals left the property in a vehicle, Detective Kinkade ordered a traffic stop. While that vehicle was being searched, the indi-

vidual told the officers, "Just put me in cuffs I'm done."[1] The officers found ten kilograms of cocaine inside the vehicle, but the arrestee had managed to warn his confederates at the property about the traffic stop. Consequently, those inside the property, including Mr. Kendrick, attempted to flee. Two of them were arrested, but the officers were unable to locate Mr. Kendrick that afternoon.

Detective Kinkade then obtained a search warrant for the property. Fifty-five kilograms of cocaine were seized, along with multiple firearms and hundreds of thousands of dollars. Detective Kinkade also obtained a warrant for and seized Mr. Kendrick's internal surveillance footage of the Massachusetts Avenue property, and he obtained another warrant to search Mr. Kendrick's residence. Mr. Kendrick was later indicted and arrested.

**B**

The indictment charged Mr. Kendrick and two other individuals with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Mr. Kendrick also was indicted for possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Mr. Kendrick filed a motion to suppress. He contended, among other things, that the use of the pole camera to surveil the property violated his Fourth Amendment rights. In rejecting this contention, the district court first distinguished this property from a residence. Noting that the pole camera could view what would be called the "curtilage" of a residence, the

---

[1] R.85-1 at ¶ 21.

court held that the concept of "curtilage" was not applicable to an industrial site such as the property in question.[2] The court noted that neither the Supreme Court nor this court has recognized "commercial curtilage."[3] Indeed, continued the district court, the Supreme Court has said that "the open areas of an industrial plant complex … are not analogous to the 'curtilage' of a dwelling, which is entitled to protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept."[4]

Turning to our own precedent, the district court next determined that, contrary to Mr. Kendrick's assertion, *United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021), did not support his position. *Tuggle* involved pole cameras recording the outside of a suspect's home around-the-clock for eighteen months straight. We determined that there was no search requiring a warrant because the cameras constituted a "technology in public use," occupied places the police were lawfully entitled to be, and observed "plainly visible happenings …." *Id.* at 511. The district court noted the factual differences between the two cases. Unlike the present property, the *Tuggle* property was a private residence. And Mr. Kendrick himself did not put up the fence around the Massachusetts Avenue property; the property owners did so, several years after Mr. Kendrick began leasing the building and for "reasons unrelated to the surveillance."[5] Also, continued the district court, what was observed by the pole camera could have been seen by any

---

[2] R.89 at 5–6.

[3] *Id.* at 6.

[4] *Id.* (quoting *Dow Chem. Co. v. United States*, 476 U.S. 227, 228 (1986)).

[5] *Id.* at 7.

ground-level passerby because the fence had a thirty-foot opening.

The district court went on to determine that there would still be probable cause to search the property even if the pole camera footage had not been considered. Many facts supported the presence of probable cause: evidence related to the GPS-recorded movements of Mr. Kendrick's car; his involvement with individuals charged with drug crimes; a drug-sniffing dog alerting to his truck; thousands of dollars found in his truck's glove compartment; his presence observed (in person, as opposed to remotely with the pole camera) at the Massachusetts Avenue property; and a car observed in person arriving at and then leaving the property just before police discovered narcotics in that car.

The district court also determined that, even if the pole camera's recordings were a search and there was no independent probable cause for the initial search warrant, the agents' actions were protected by the good-faith exception to the warrant requirement. There was "plentiful evidence" that amounted to probable cause to support the warrants, and the officers' reliance on the warrants was objectively reasonable.[6]

After the district court denied his motion, Mr. Kendrick pleaded guilty to the drug conspiracy count while preserving his right to appeal the denial of the suppression motion. The firearm count was dismissed on motion of the Government. Mr. Kendrick was sentenced to 140 months' imprisonment and five years of supervised release.

---

[6] *Id*. at 12.

## II

## DISCUSSION

Mr. Kendrick contends that the installation and use of the pole camera outside his business constituted an impermissible search. He also contends that without information derived from the pole camera there would not be probable cause to support the search warrant application for the premises and that the Government may not rely on the good-faith exception to the warrant requirement. In reviewing the denial of a motion to suppress, we review findings of fact for clear error, and we review legal conclusions de novo.[7] A factual finding is clearly erroneous only if the court "cannot avoid or ignore a definite and firm conviction that a mistake has been made."[8]

"To determine whether the government conduct here constitutes a 'search' within the meaning of the Fourth Amendment, we apply the 'privacy-based approach' first articulated by Justice Harlan in his concurrence in *Katz*." *United States v. House*, 120 F.4th 1313, 1316 (7th Cir. 2024) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). First, we ask whether Mr. Kendrick "manifested a subjective expectation of privacy in the object of the challenged search, and second, whether society is willing to recognize that expectation as reasonable." *Id.* (citation modified). However, as we pointed out in our decision in *Tuggle*, "we primarily focus our attention on *Katz*'s *objective* inquiry." 4 F.4th at 514 (emphasis added).

Mr. Kendrick's discussion of his subjective expectation is centered significantly on our discussion of a hypothetical in

---

[7] *United States v. Jackson*, 103 F.4th 483, 486 (7th Cir. 2024).

[8] *Id.* (quoting *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022)).

*Tuggle*. There, we cautioned that we were not "confront[ing] the more challenging situation in which the government intentionally places cameras to see *over* a fence to observe a private residence in a manner unavailable to a ground-level passerby." *Id.* at 513 (emphasis in original). Mr. Kendrick asserts that the fence here was "a clear barrier to public observation—the very kind of measure that distinguishes protected private space from publicly visible areas."[9] He further submits that it is irrelevant that his landlord arranged the fence's installation. In his view, what matters is whether he "manifested and reasonably relied on the privacy it provided," because the Fourth Amendment protects "people, not places."[10] The Government contends that besides the act of installing the fence, there are no other actions that could be attributed to Mr. Kendrick "express[ing]" a subjective expectation of the privacy of his business property.[11]

In *House*, we affirmed our prior holding in *Tuggle*. Law enforcement installed a pole camera pointed at the front of House's residence and allowed it to record footage for over a year. *House*, 120 F.4th at 1315. However, House had a privacy fence surrounding his backyard. *Id.* at 1317 n.3. Because House did not try "to shield the front of his residence from the eyes of ordinary passersby," he "did not express a subjective expectation of privacy of the kind that *Ciraolo* recognized as valid for shielding the activities in the curtilage of a home." *Id.* at 1317. In *Ciraolo*, the Supreme Court held that police did

---

[9] Appellant's Br. 12–13.

[10] *Id.* at 13 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).

[11] Appellee's Br. 22–23 (quoting *United States v. House*, 120 F.4th 1313, 1316–17 (7th Cir. 2024)).

not need a warrant to take photographs from a low-flying plane of a defendant's property, which was shielded at ground level by six-foot and ten-foot fences. *California v. Ciraolo*, 476 U.S. 207, 209, 213–14 (1986).

We think that the Supreme Court's decision in *Ciraolo* and our decisions in *House* and in *Tuggle* provide the surest pathway in this case. The fence described in this record simply did not provide Mr. Kendrick with a subjective expectation of privacy in the comings and goings of his associates. The fence had a thirty-foot gap in front of the large garage through which vehicles and people could enter the property. Mr. Kendrick and others used that gap to enter the garage and the building. And Detective Kinkade was able to see them move around through the gap while he was surveilling the property. Although there was a fence, that fence did not obstruct from the view of passersby the areas of interest. The presence of the fence therefore does not provide support for Mr. Kendrick's claim that he had a subjective expectation of privacy in the comings and goings of himself and his confederates.

Mr. Kendrick next contends that, in addition to his subjective expectation, he had an objectively reasonable expectation of privacy. As we noted earlier, this inquiry must be our primary concern. Although the Fourth Amendment extends less protection to commercial properties than to residential properties, Mr. Kendrick asserts that it is still objectively reasonable to expect privacy in the activities that take place behind a fence on a business property. We now turn to an examination of this argument.

"[T]he government does not invade an expectation of privacy that society is prepared to accept as reasonable when the

government uses a common technology, located where offic-
ers are lawfully entitled to be, and captures events observable
to passersby." *House*, 120 F.4th at 1318. We decided *House* af-
ter the district court here denied Mr. Kendrick's motion to
suppress, but *House* supports affirming the district court's
judgment.

We previously determined, moreover, that "a chain-link
fence does little to assert a privacy interest … in details visible
from outside the fence." *United States v. Tolar*, 268 F.3d 530,
532 (7th Cir. 2001). In *Tolar*, we addressed an incident in
which police officers gained permission from a business's
owner to enter the premises and examine the cargo of a truck
that had recently arrived. Tolar, the owner, agreed, and the
officers found thousands of kilograms of cocaine and mariju-
ana. Tolar was arrested for his role in the drug operation and
filed a motion to suppress. We determined that there was no
Fourth Amendment violation. The business had a lot that
could "be observed by anyone passing on the street." *Id.* It
was surrounded by a chain-link fence with barbed wire on
top, but it had an open gate. "An open gate invites entry," and
the fence "does little to assert a privacy interest (as opposed
to a property interest) in details visible from outside the
fence." *Id.* Here, the fence was not a chain-link one, so pass-
ersby would only be able to see through one of the gaps or
over the fence. Still, given the sizeable thirty-foot gap, the
events captured by the pole camera were observable to pass-
ersby.

The pole camera here was also in a location where officers
were "lawfully entitled to be." *See House*, 120 F.4th at 1318. It
was installed on a utility pole on public property. So, too,
were the cameras at issue in *Tuggle*. 4 F.4th at 511. These deci-

sions again find support in the Supreme Court's decision in *Ciraolo.* There, the Court made clear that the Fourth Amendment's protection of the home does not extend to "an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213. Because the Supreme Court has upheld police using aircraft to view properties hidden by fences from above, see *id.* and *Dow Chemical Co. v. United States*, 476 U.S. 227, 239 (1986), using a camera on top of a utility pole is similarly permissible.

The pole camera employed here also used "common technology." *House*, 120 F.4th at 1318. It "had the ability to tilt, zoom, and pan, but did not have infrared/night vision capabilities."[12] The camera had no features that distinguished it from the type that are in "general public use." *Tuggle*, 4 F.4th at 516 (quoting *Kyllo v. United States*, 533 U.S. 27, 40 (2001)).

The facts in this case are therefore distinct from the hypothetical we raised in *Tuggle*. Not only was the fence here *not* installed on a "private residence," but the camera was not placed on the pole to observe the property "in a manner unavailable to a ground-level passerby." *Id.* at 513. Detective Kinkade's declaration, with all the observations he made without the pole camera, makes that clear.[13]

---

[12] R.85-1 at ¶ 10.

[13] Detective Kinkade made multiple observations of people in and around the Massachusetts Avenue property from a vantage point nearby. After viewing suspicious pole camera footage on May 31, he stationed himself near the property. He used both the streaming video from the pole camera and his vantage point to view the activities near the gap in the fence. R.85-1 at ¶¶ 13–19. Viewing through the gap in the fence, Officer Kinkade saw a car drive up and a person exit the vehicle holding a suitcase, enter the

Finally, the Supreme Court has established that "the Government has greater latitude to conduct warrantless inspections of commercial property because the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home." *Dow Chemical*, 476 U.S. at 237–38 (citation modified).

Considering that reduced privacy interest, as well as our observation in *Tolar* that a fence does not assert a strong privacy interest when passersby can see past it, we must conclude that Mr. Kendrick did not have an objectively reasonable privacy interest in his activities captured by the pole camera.

**Conclusion**

The judgment of the district court is affirmed.

AFFIRMED

---

property, then exit the property five minutes later and open and close the trunk of the car. *Id.* at ¶¶ 18–20. Officer Kinkade believed that to be evidence of narcotics activity and directed a traffic stop of the car. A few minutes later, police conducted the stop, and the driver—the person Officer Kinkade saw—told the officers, "Just put me in cuffs I'm done." *Id.* at ¶ 21. A search of the person's car turned up ten kilograms of cocaine. *Id.* Although Officer Kinkade also relied on the pole camera to view other activities, some of those activities could be seen by a passerby at ground level. *Id.* at ¶¶ 15 (describing Mr. Kendrick and one other person exiting the property and getting into Mr. Kendrick's pickup truck that was parked outside the fenced area), 16 (describing a Yukon returning to a parking spot outside the fence), 17 (describing Mr. Kendrick leaving the business in a GMC truck).